# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                                    Case No. 21-CR-162-JFH

JUSTIN DALE LITTLE,

          Defendant.

## OPINION AND ORDER

Before the Court are two (2) motions to suppress evidence filed by Defendant Justin Dale Little ("Defendant"): one on Fourth Amendment grounds and one on Fifth Amendment grounds. Dkt. No. 54; Dkt. No. 56. The United States of America ("Government") opposes the motions. Dkt. No. 68; Dkt. No. 64. The Court held a hearing on the motions on October 26, 2022. For the reasons stated below, both motions are DENIED.

## STANDARD

A suppression motion under Federal Rule of Criminal Procedure 12(b)(3)(C) is meant to "determine preliminarily the admissibility of evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). The Federal Rules of Evidence generally do not apply to suppression issues. *Id.* (citing Fed. R. Evid. 104(a)). "On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). "The defendant has the burden of showing the Fourth [or Fifth] Amendment was implicated, while the government has the burden of proving its warrantless actions were justified." *Id.* (citing *United States v.*

*Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)).  Both these burdens require proof by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).  The Court must state essential factual findings on the record.  Fed. R. Crim. P. 12(d).

## BACKGROUND[1]

Defendant is charged with one count of first degree murder in the killing of Johnathon Weatherford[2] ("Weatherford") on April 22, 2018.  Dkt. No. 2.  Weatherford was found by a bystander laying on train tracks in Jenks, Oklahoma with a gunshot to the back around noon that day.  The bystander called 911, which dispatched Jenks Police Department ("JPD") and other emergency responders.  JPD Detective Melissa Brown ("Brown") arrived at the scene around 12:09 p.m. and took the lead on the investigation.  Dkt. No. 55-1 at 2.

The morning of the charged conduct, Weatherford had been at a residence with Hannah Watkins ("Watkins"), who had romantic history with each Weatherford and Defendant.  Watkins and Defendant have a son ("E.L.") together and had legally married two (2) days before the charged conduct, as Watkins believed the marriage was necessary for their son to receive full benefits as Defendant's dependent.  The morning of the charged conduct, Watkins asked Weatherford to leave the residence before Defendant brought E.L. to her.  Watkins did not witness the shooting.

---

[1]  The evidentiary basis for the background recapped herein includes the exhibits to Dkt. No. 54 (filed as Dkt. No. 55 and Dkt. No. 62) and Dkt. No. 56 (filed as Dkt. No. 57 and Dkt. No. 61), which the Government stipulated to at hearing, as well as the testimony of Melissa Brown at the October 26, 2022 hearing.

[2]  The indictment spells the alleged victim's first name as "Jonathan."  The Court adopts the spelling used in reports issued by the Jenks Police Department and the Office of the Chief Medical Examiner.

During the afternoon and evening of April 22, 2018, patrol officers canvased the area near where Weatherford was found, searching for witnesses and video surveillance. Dkt. No. 55-1 at 3. Witnesses described a white Chevrolet Silverado pickup truck with a sticker of multiple firearms and the word "family," which matched the description of Defendant's vehicle. Brown testified that JPD was able to review video surveillance that day showing a white Chevrolet Silverado pickup truck that drove down the road, around the corner, and to the location of the shooting. She explained on cross-examination that JPD reviewed these videos during the day of April 22, 2018 but that it was only able to obtain still pictures, not digital copies of the full videos, at the time. *See also* Dkt. No. 55-1 at 4 (explaining that recordings from Jenks Public Schools cameras needed a third party to access them). Officers obtained physical copies of several videos in the days after the shooting. *Id.*

Watkins was interviewed several times. During the first interview—which occurred on the afternoon of the charged conduct and was recorded on Brown's body camera—she told Brown that she was not aware of threats between Defendant and Weatherford.[3] However, she also told Brown, "I feel like he's the only person that could have done this—I mean, not could have; I mean, it could have been any other person, but I feel like that's not likely" because Defendant was the only person Watkins knew who was "crazy enough" and "had enough motive" to "flip some shit." Watkins told Brown that she was concerned for E.L's safety with Defendant because she "heavily believe[d]" Defendant had shot Weatherford. Watkins told Brown that Defendant owned multiple firearms and always carried a 9mm handgun with him.

---

[3] During later interviews, Watkins told Brown that Defendant "had made threats to Weatherford in the past, near the end of January or early February and that many people knew of those threats." Dkt. No. 55-1 at 3.

Brown testified that although Watkins did not report threats between Defendant and Weatherford on the day of the charged conduct, other people did.  She stated multiple people came to the JPD station after the news of the shooting broke, with three or four people reporting that there had been past violence or threats between Defendant and Weatherford.  Multiple search warrants state that Weatherford's ex-girlfriend, Jana Robinson ("Robinson"), came to JPD on April 22, 2018 around 7:00 p.m. and reported that Defendant had previously made death threats to Weatherford, including some through social media.  Dkt. No. 55-5 at 3, 6-7, 10, 15, 19, 26.  One search warrant states another witness, Landon Ellenburg ("Ellenburg"), told officers at an unspecified time on April 22, 2018 that "messages . . . involving conflict" between Defendant and Weatherford had been exchanged on Facebook Messenger and Snapchat.  *Id.* at 26.  Brown also testified that Ellenburg reported prior incidents between Defendant and Weatherford.

During Watkins' April 22, 2018 interview, Brown asked her if Defendant would come to Watkins' apartment if Watkins called him.  Watkins said she believed he would.  In the evening of April 22, 2018, around 8:00 p.m., Watkins called Defendant and asked him to come visit her. Defendant drove a red Toyota Camry sedan owned by his mother, Sherri Bear ("Bear"), rather than his white Chevrolet Silverado pickup truck.  When he arrived outside Watkins' front door, body camera footage shows several JPD officers approached him with firearms drawn, told him to lay down, and then told him to put his hands out and cross his feet.  Brown approached and handcuffed Defendant, then helped him to stand and walked him toward a cluster of squad cars.

During the walk from Watkins' apartment to a squad car, Brown asked Defendant if he had things in his pockets and why he did not drive his car.  Defendant said he had gotten a flat tire and that his truck had gotten stuck when he had gone to Edna, Oklahoma, that morning.  Brown then told Defendant he was being detained in Weatherford's homicide, to which Defendant responded,

"What?"  Brown repeated that Defendant was being detained in Weatherford's homicide, and Defendant asked, "Was he killed?"  When Brown answered affirmatively, Defendant asked when and what time.  Brown responded that they would talk when they got to the JPD station and that other officers were coming to pat him down.  Defendant said he had left his jacket and phone somewhere and asked officers to get them, which Brown said they would.  JPD Officer Nicholas Chandlee ("Chandlee") then patted down Defendant, who informed Chandlee that there were keys in his shorts pocket along with dog tags around his neck.

At one point in the video, Brown says that she wanted to "take" the red Toyota sedan Defendant drove to Watkins' apartment even though he had not driven the sedan that morning, as she believed the weapon from the shooting may have been in it based on Watkins' statement that Defendant always carried a gun with him.  Several officers then surrounded the vehicle and located a cell phone in plain sight.  They retrieved the phone and Brown handed it to Chandlee, who made a frustrated noise after discovering the phone required a "fingerprint pattern" to unlock it. Chandlee then said that he was going to take the phone to Defendant to see if he would put it in airplane mode, making air quotes as he said, "so that 'the battery wouldn't die'" and remarking that that would yield Defendant's pattern or passcode.  Chandlee then approached Defendant, who was seated in a squad car.  When Chandlee asked Defendant if the phone was his, Defendant replied, "Yes.  Need the passcode?"  Chandlee responded, "Yeah, I was gonna put it in airplane mode for you so that the battery wouldn't die."  Chandlee offered Defendant the option to "swipe" it or have Chandlee swipe it, and Defendant volunteered the pattern to unlock the phone.

After JPD transported Defendant to its station, Brown and Officer Jason Weis ("Weis") placed him in an office with a round table around 9:30 p.m.  Brown immediately mirandized Defendant, reading his rights to him and then presenting him with a written waiver, which he

signed.  Brown asked Defendant if he wished to talk to them right now, to which Defendant said, "I just wanna know what's all goin' on."  Det. Brown then told Defendant that he could tell them he didn't want to answer questions at any time.  Brown and Weis questioned Defendant for approximately forty-three (43) minutes.  Defendant gave several conflicting stories, discussed Watkins' various past boyfriends, and denied being acquainted with Weatherford.  At one point, he told the officers he thought that an ex-girlfriend of the alleged victim had put a hit on Weatherford.  Defendant denied driving his pickup truck to Jenks, saying it had already gotten stuck and that he was driving his mother's car.  He also repeatedly denied shooting Weatherford.  After approximately forty-three (43) minutes, the officers left Defendant alone in the room for almost thirty (30) minutes.

When they returned, Brown and Weis were more confrontational in their questions than before.  Brown told Defendant she knew Defendant was the one who shot Weatherford.  In response, Defendant asked if they had him on video and, when Brown said yes, he asked to see the video.  Defendant also continued to deny that he drove his truck to Jenks.  Defendant repeatedly requested the surveillance video and wanted to review the video with Brown and Weis.  He then changed his story, admitting he did drive his truck the first time he went to Jenks that day and admitting that he saw Weatherford near the tracks.  Defendant told Brown and Weis that he was going to confront Weatherford about taking care of E.L. during Defendant's upcoming deployment, but he changed his mind.  Defendant also made conflicting statements about how long or well he knew Weatherford.

Toward the end of the recording, Weis and Defendant raised their voices with each other.  Defendant reached across more than half the table and pointed at something on Weis' notepad.  Weis brushed Defendant's hand back, which caused Defendant to immediately recoil and say,

"Please don't touch me."  When Weis asked why, Defendant said he felt "a little bit threatened right now," and Weis immediately apologized.  The interview concluded approximately two (2) hours after it initially began.

Later in the evening of April 22, 2018, Brown visited Bear's home, where Defendant had been living.  Bear confirmed that Defendant drove his pickup truck to Jenks that morning.  When Brown asked if there were guns in the residence, Bear said she had some and that Defendant had some "in the living room" because they only had one bedroom.  Brown asked Bear if she could show them the guns.  After they entered the living room, Brown asked Bear if the living room was where Defendant and E.L. slept and Bear said yes before pointing out several firearms she said belonged to Defendant.  Brown also asked Bear if Bear came into the living room to watch television, to which Bear said, "Eh, sometimes, yeah."

Brown questioned Defendant again on the morning of April 23, 2018.  Chandlee, rather than Weis, sat in on this second interview.  At the beginning of the interview, Brown told Defendant that his *Miranda* rights still stood.  She then asked Defendant if he still wanted to talk to them.  Defendant replied, "Yeah, I can still talk to you.  I wanted to talk to a lawyer—I just, wanted to see where I stand at right now."  Brown then gave a summary of the case and theory so far and Defendant actively participated in the conversation.

The April 23, 2018 interview included questions about details, such as places where Defendant was parked, where cameras were located, what roads he drove, and what his timeline was like.  Defendant was calm and level-headed throughout the interview.  He requested to watch surveillance video again.  Brown tells Defendant at one point that they were "bluffin' him a little bit" the night before.  Throughout the interview, Brown told Defendant that it looked likely that he will be booked on and charged with first degree murder.  She asked him for mitigating

information that would support a lesser booking or a lesser charge, which would potentially carry a lighter sentence.  Brown expressed regret at the idea of Defendant and his son being separated indefinitely if he was booked on and later convicted of first degree murder, but her references to Defendant's son and Defendant's responses were made in even tones of voice with no particular emphasis or emotion distinct from the overall conversation.

Approximately an hour into the April 23, 2018 interview, Defendant attempted to invoke counsel by saying, "You know, I really came out here at first to actually talk to a lawyer."  Brown asked, "Out where?" and Defendant replied, "Y'all said you were going to appoint me a lawyer."  Brown then asked if he wants to talk to a lawyer and he said, "Yeah.  I just kinda want to see where I stand at and everything."  Brown answered, "You don't want to talk to me anymore?"  Defendant replied, "I would gladly, but I'd like to just see where I stand at right now."  Brown asked if he had a lawyer he would like to call and he said no, that he would like them to appoint him one.  She explained that JPD couldn't appoint him a lawyer, but that they could let him call Bear so that she could try to hire an attorney for him.  Brown and Chandlee then left to arrange Defendant's phone call.

Between April 23 and April 26, 2018, officers obtained search warrants for Defendant's phone; AT&T cell phone location data; Defendant's white pickup truck; Bear's red sedan; and Defendant's Facebook account.  Dkt. No. 55-5.  Each warrant is between seven (7) and fourteen (14) individual numbered paragraphs describing investigative efforts, such as JPD's interview of Bear, its review of security camera footage, and the reports Robinson and Ellenburg made on April 22, 2018.  The search warrants also mention that Jenks High School video footage showed "a white, single cab, Chevrolet Silverado" and that Defendant "was found at the residence of

[Watkins] at approximately 8:00pm and was detained for questioning and brought to the Jenks Police Department."

Defendant's arrest warrant was issued on April 30, 2018. Dkt. No. 55-6. The affidavit is seven (7) single-spaced pages, printed in 11-point Calibri typeface. *Id.* It has sixteen (16) numbered paragraphs, with most paragraphs having multiple lettered subparagraphs. *Id.* The warrant has almost two (2) full single-spaced pages describing the positioning of multiple cameras and videos from those cameras reviewed by officers, including multiple videos showing the distinctive "gun family" sticker on Defendant's vehicle. *Id.* at 4-5. There is also one mention that "at 1140 hours J. Little was seen by Larry Kern [sic] parked in a parking lot." *Id.* at 5. Other statements in the affidavit include but are not limited to summaries of Ellenburg's report of social media threats; Defendant's two JPD interviews; a forensic interview of E.L., who said that "Daddy shot his friend and he died [and E.L.] watched Weatherford fall and die;" forensic investigation of Defendant's phone, which indicated most of the day of April 22, 2018 had been deleted; and cell phone tower location information placing Defendant in the area of the shooting during the relevant time frame. *Id.* at 5-8.

## AUTHORITY AND ANALYSIS

### I.   Fourth Amendment motion [Dkt. No. 54]

### A.  Probable cause for arrest

Defendant alleges that he was placed under arrest on the evening of April 22, 2018 when officers "surrounded [him] at gunpoint, handcuffed him, searched his person, locked him up overnight, and subjected him to multiple interrogations." Dkt. No. 54 at 6. He claims the arrest lacked probable cause and that all fruits of the arrest—including data from his phone; the

statements he made during interviews with JPD on April 22 and April 23, 2018; and the evidence found in his and his mother's vehicles—must be suppressed. *Id.* at 6-9.

"An investigative detention is a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quotation omitted). Conversely, "[a]n arrest is distinguished by the involuntary, highly intrusive nature of the encounter." *Id.* (quotations and citations omitted). Brevity is important for investigative detentions—neither the Supreme Court nor the Tenth Circuit has considered detentions lasting ninety (90) minutes or longer "to be anything short of an arrest." *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) (citing *United States v. Place*, 462 U.S. 696, 709-10 (1983)). "Whether an investigative detention has evolved into an arrest is always a case-specific inquiry, but it has been clear for some time that the use of handcuffs generally converts a detention into an arrest." *Id.* at 1150; *see also id.* (detention in a squad car while handcuffed was an arrest, not an investigative detention). Use of firearms may also convert a detention to an arrest. *Cortez*, 478 F.3d at 1116.

The Court agrees with Defendant that the events of April 22, 2018 constituted an arrest. Body camera footage shows that JPD approached Defendant with firearms drawn, told him to lay on the ground with hands and feet visible, and immediately handcuffed him. Defendant was then placed in a squad car with an officer for an unclear amount of time before being taken to JPD's station. Once at the station, he was interviewed for more than an hour, held overnight, and interviewed again in the morning. However, the Court disagrees with Defendant's conclusion that the arrest occurred without probable cause.

"A police officer may arrest a person without a warrant if he [or she] has probable cause to believe that person committed a crime." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).

"Probable cause is a concept 'incapable of [a] precise definition or quantification into percentages.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).  However, the Supreme Court and the Tenth Circuit have described that an officer has probable cause to make a warrantless arrest if the facts and events known to the officer at the time of the arrest would be sufficient for an objectively reasonable police officer familiar with those facts and events to believe with "substantial probability[,] as opposed to a bare suspicion," that an offense has been or is being committed. *Id.  See also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).  This is "not a high bar" and requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Hinkle*, 962 F.3d at 1220 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  Officers may rely on the totality of the facts available to them in establishing probable cause. *See id.* at 1221.

The Court finds Brown and other JPD officers had probable cause to arrest Defendant on the evening of April 22, 2018.  According to Brown's testimony, they had reviewed video footage of Defendant's distinctive vehicle at the crime scene.  The fact that investigators had not obtained their own copies of the digital files with this footage does not dissipate their knowledge of what the videos contained.  Watkins had told Brown that Defendant was always armed.  Multiple people, including Robinson and Ellenburg, had reported a history of antagonism or threats between Defendant and Weatherford.  Although Watkins said she did not know of past threats by Defendant toward Weatherford, she also told Brown, "I feel like [Defendant is] the only person that could have done this—I mean, not could have; I mean, it could have been any other person, but I feel like that's not likely" because Defendant was the only person Watkins knew who was "crazy enough" and "had enough motive" to "flip some shit."  Watkins also reported that she feared for

the safety of the child she shared with Defendant because of the day's events. These facts, along with the totality of the circumstances depicted in Brown's body camera footage and testimony at hearing, satisfy the threshold for probable cause. No Fourth Amendment violation occurred in JPD's arrest of Defendant on April 22, 2018.

### B.  Search of Defendant's residence

Defendant challenges the search of his mother's one-bedroom residence, where he had been sleeping in the living room with his son. Body camera footage shows that Bear allowed officers to search the living room after they asked her if she watched television there and she replied "Eh, sometimes, yeah." Defendant claims Bear did not have authority to consent to the search because the "footage demonstrates that the room was not used as a common living room but was in fact [Defendant's] and his son's bedroom." Dkt. No. 54 at 11.

"A third party's consent to search is valid if that person has either the actual authority or the apparent authority to consent to a search of that property." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004) (quotation and citation omitted).[4] Actual authority exists if the third party has "either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)). The "gravamen" of this rule is "it is reasonable to recognize that 'any of the co-habitants has the right to permit the inspection in his [or her] own right and . . . the others have assumed the risk that one of their number might permit the common area to be searched.'" *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7). Apparent authority exists if "the facts available to the officer at the moment warrant[ed] a [person] of reasonable caution to believe that the consenting party had authority over the

---

[4]  The Court notes that Defendant does not cite or discuss *Kimoana* or other third-party consent cases, such as *Rith* or *Matlock*. He relies instead on *United States v. Werking*, 915 F.2d 1401 (10th Cir. 1990), which addressed only a defendant's consent to search.

premises." *Id.* (quoting *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998)). Common authority cannot be implied from a "mere property interest," nor does it require a property law inquiry; it rests "on mutual use of the property generally having joint access or control for most purposes." *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7).

The Court finds that Bear had actual or apparent authority to consent. Contrary to Defendant's depiction of Brown's body camera footage, the recording shows that Bear referred to the room in question as "the living room"—not as Defendant's bedroom. After Brown and Bear entered the living room, Brown asked Bear if the living room was where Defendant and E.L. had been sleeping. Bear did not volunteer that information, nor did she treat the room like she was entering another's private space. Bear reached into a large pile of personal property without hesitation, pulling out firearms she said belonged to Defendant. Bear also said that she sometimes came to watch television in the room. The facts depicted in this recording create a reasonable objective conclusion that Bear had authority over the premises, including the room where Defendant slept.

### C.  Seizure of the red Toyota sedan

When JPD arrested Defendant on April 22, 2018, he had driven his mother's car to Watkins' apartment. Body camera footage shows officers planning to seize the vehicle and get a warrant before searching it. Defendant alleges that the warrantless seizure of the car was illegal because the search warrant obtained the next day was based on information that officers did not have at the time that they seized the vehicle.[5]

---

[5]  The Government does not contest Defendant's standing to object to seizure of the car he was driving. Dkt. No. 68 at 6-9. Nevertheless, "standing is a matter of substantive fourth amendment law" and Defendant "may not challenge an allegedly unlawful search or seizure unless he demonstrates that his *own* constitutional rights have been violated." *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (emphasis added). Body camera footage from

The general rule that warrantless search or seizure is per se unreasonable under the Fourth Amendment has a few specifically established and well-delineated exceptions, one of which is the "automobile exception." *United States v. Burgess*, 576 F.3d 1078, 1087 (10th Cir. 2009).[6]  This doctrine developed first because "a 'necessary difference' exists between searching 'a store, dwelling house or other structure' and searching 'a ship, motor boat, wagon or automobile' because a 'vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925)).  Later, the Supreme Court "introduced an additional rationale based on 'the pervasive regulation of vehicles capable of traveling on the public highways.'" *Id.* (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)).

Under the automobile exception, "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Id.* (quotation omitted).  "The right to search and the validity of the seizure are not dependent on the right to arrest.  They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *United States v. Lopez*, 777 F.2d 543, 550 (10th Cir. 1985) (quoting *Carroll*, 267 U.S. at 158-59).  *See also id.* at 551 ("The probable cause requirement is satisfied when the officers conducting the search have reasonable or probable cause to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin

_____

officers' interactions with Bear demonstrate that Defendant had driven the car with Bear's permission.  "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *Id.*  The Bear video is sufficient to establish standing.

[6] The Court notes that Defendant again did not cite the appropriate doctrine, relying on the general per se unreasonableness rule without mention of the century-old and well-developed automobile exception.  *See* Dkt. No. 54 at 11-12.

their warrantless search." (quoting *United States v. Matthews*, 615 F.2d 1279, 1287 (10th Cir. 1980))).  When officers "have probable cause to believe a vehicle contains contraband or evidence of criminal activity, the police may seize it without a warrant and hold it for 'whatever period is necessary to obtain a warrant for the search.'"  *United States v. Shelton*, 817 F. App'x 629, 634 (10th Cir. 2020) (quoting *Chambers v. Maroney*, 399 U.S. 42, 51-52 (1970)).[7]

Here, the officers seized but did not search the vehicle before obtaining a warrant.  The warrantless seizure was simultaneous with Defendant's arrest and probable cause existed based on similar facts—particularly that Watkins had told JPD that Defendant was always armed, which created a reasonable basis to believe that officers would find a firearm from the charged conduct in the vehicle Defendant was driving.  Hence, the automobile exception applies, and no constitutional violation occurred in the seizure of Defendant's mother's vehicle.

### D.  Location records

Defendant invokes *Carpenter v. United States*, 138 S. Ct. 2206 (2018), to advance a theory that investigators' subpoena of his PikePass automated toll road payment records was a Fourth Amendment violation.  Dkt. No. 54 at 12-13.  *Carpenter* was a narrowly tailored decision on facts that involved years of data compiled from an individual's cell phone.  *See* 138 S. Ct. at 2220 (describing the case as being "about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years").  It specifically did not address "a person's movement at a particular time" or "business records that might incidentally reveal location information." *Id.*  Toll transaction records are primarily business records which incidentally reveal

---

[7] Unpublished opinions are not binding precedent but may be cited for their persuasive value. *See* 10th Cir. R. 32.1; Fed. R. App. P. 32.1.

discrete location information.  *Carpenter* does not control.  Nor does Defendant's theory withstand scrutiny under general Fourth Amendment law.

"A defendant invoking the protection of the Fourth Amendment 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'"  *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  This requires both subjective and objective components. *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009).  "[T]he Supreme Court has appeared to utilize four distinct but coexisting approaches to the reasonable expectation of privacy test, reflecting four models of Fourth Amendment protection: a probabilistic model, a private facts model, a positive law model, and a policy model."  *Id.*  (quotation and citation omitted).  Defendant has not demonstrated that he had either a subjectively reasonable or an objectively reasonable privacy interest in PikePass records under any of these theories.  As the Government correctly points out, Defendant "chose to use the toll road when he could have taken non-toll roads," he "chose to pay with PikePass rather than pay the toll in cash," and "[t]he same information could be obtained from a security camera recording at the toll booth."  Dkt. No. 68 at 10.  No Fourth Amendment violation occurred in investigators' subpoena of PikePass records.

### E.  Warrant affidavits

In his last Fourth Amendment argument, Defendant alleges that warrant affidavits omitted crucial information that tended to dissipate probable cause, misrepresented evidence crucial to establishing probable cause, and misrepresented circumstances relating to Defendant's arrest on April 22, 2018.  Dkt. No. 54 at 13-17.  Defendant identifies three (3) alleged material misrepresentations.  First, Kerns told police that he saw a man between the ages of twenty-five (25) and thirty-five (35) with dark hair and a mustache, but Defendant says he did not have a

mustache at the time. *Id.* at 14. Second, warrant affidavits said that security camera footage showed the make and model of the vehicle near the shooting, but still photos collected from the surveillance do not show that detail. *Id.* And third, the affidavits state that Defendant was "found" at Watkins' apartment when actually "Ms. Watkins[] coordinated [Defendant's] arrest by calling him and asking him to come to her home so that the police could arrest him." *Id.* at 15.

To merit suppression from misrepresentations or omissions in a warrant, a defendant must establish at "hearing by a preponderance of the evidence that the false statement was included in the affidavit by the affiant 'knowingly and intentionally, or with reckless disregard for the truth,' and the false statement was 'necessary to the finding of probable cause.'" *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).[8] The Tenth Circuit elaborated,

> [W]hether we're talking about acts or omissions the judge's job is much the same—we must ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts. If so, the contested misstatement or omission can be dismissed as immaterial. If not, a Fourth Amendment violation has occurred and the question turns to remedy.

*United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015). When considering whether a false statement was necessary to probable cause, the Court should keep in mind the general rule that "One of the Supreme Court's central teachings on the Fourth Amendment is that probable cause is a practical, nontechnical conception, designed to operate in conjunction with the commonsense, practical considerations of everyday life, rather than the elaborate rules employed by legal technicians." *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009) (quotations omitted).

---

[8] At the October 26, 2022 hearing, the Court made an oral finding that Defendant had met the preliminary threshold required for a *Franks* hearing. However, Defendant did not question Brown about the warrant affidavits at the October 26, 2022 hearing despite the opportunity to do so.

"Because probable cause is a flexible, commonsense standard, we must interpret the Government's affidavit in a flexible, commonsense way." *Id.* at 1282.  Here, Defendant has failed to establish that there were knowing, intentional, or reckless false statements made in the warrant affidavits, and certainly failed to establish that any such statements were necessary to a probable cause finding.

Regarding Defendant's facial hair or lack thereof, the warrants are silent.[9]  Only Defendant's arrest warrant—not the various search warrants—describes his physical appearance or mentions Kerns at all.  His physical appearance was stated only briefly, while the vast majority of affidavit describes physical and digital evidence connecting Defendant to the scene of the charged conduct.  Defendant has not proven a false statement or omission here.   And even if he had, Defendant's facial hair was immaterial to probable cause given the location data, surveillance footage, and admissions by Defendant himself all demonstrating he was in proximity to the scene of the charged conduct at the relevant time.

Regarding the video footage, search warrants do mention that Jenks High School video footage showed "a white, single cab, Chevrolet Silverado."  Defendant attempts to demonstrate falsity through several still photos which do not show the make or model of the white pickup truck pictured in them.  However, Brown testified that more was visible in the videos JPD reviewed than was visible in the still photos they captured that day.  Defendant has not proven a false statement.  Further, even if the statement that video footage showed make and model was proven to be false and excised from the relevant[10] warrant affidavits, probable cause would still exist.  The affidavits

---

[9]  Moreover, the Kerns statement upon which Defendant relies is equivocal about facial hair:  it states "person was 25-35 dark hair & mustache *(I think)*."  Dkt. No. 55-8 at 2 (emphasis added).

[10]  The search warrant for Bear's red Toyota sedan does not mention the video footage since the sedan was not present that morning.

described the way that Defendant's story shifted throughout his interviews with law enforcement and the way Defendant eventually admitted that he was at the scene of the charged conduct.  They also included Bear's confirmation that Defendant had been driving his white Chevrolet pickup truck that morning, as well as Robinson's and Ellenburg's statements that Defendant had sent threatening messages to Weatherford over social media.

Finally, Defendant has not established that the statement that JPD "found" Defendant at Watkins' apartment was false.  Defendant's whereabouts were unknown during the afternoon of April 22, 2018.  JPD was trying to locate him.  They asked Watkins for her help and Watkins invited Defendant to her apartment.  When he arrived, JPD did indeed "find" him in at least one sense of the word.  And once again, the warrants affidavits had plenty of factual detail for probable cause even if the sentence about Defendant being "found" were removed.

## II.    Fifth Amendment motion [Dkt. No. 56]

### A.    *Miranda* issues

#### 1.    Pre-*Miranda* April 22 statements

At hearing, Defendant argued that the questions at the time of his April 22, 2018 arrest coupled with later post-*Miranda* questions once Defendant was at the JPD station constituted an improper two-step interrogation under *Missouri v. Seibert*, 542 U.S. 600 (2004).  There were two main types of questioning at the time of Defendant's arrest:  first, Brown asking him about the contents of his pockets and why he did not drive his pickup truck to Watkins' apartment, and second, Chandlee asking him for his phone passcode.

The Court finds *United States v. Carrizales-Toledo*, 454 F.3d 1142 (10th Cir. 2006), instructive.  There, a law enforcement officer initiated a traffic stop with a defendant who had more than five hundred (500) pounds of marijuana in his vehicle.  When the officer initially

stopped the defendant, the officer asked him, "What he's doing." Defendant replied with a "brief (albeit damning) reply that he was trying to evade the agent to avoid being caught with 'that stuff.'" *Id.* at 1151. The officer asked, "With what stuff," and the defendant said, "This stuff. The marijuana." *Id.* at 1152. Defendant was subsequently arrested and read *Miranda* warnings, after which he again confessed. *Id.* at 1148. He sought suppression on the theory that the situation constituted an improper two-step interrogation under *Seibert* because he was not mirandized before his first confession and the second confession was a direct result of the first. *Id.*

The Tenth Circuit distinguished *Seibert* from an earlier Supreme Court case, *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, the Court "rejected the theory that [an] initial, unwarned statement creates a 'lingering compulsion' based on the 'psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate.'" *Carrizales-Toledo*, 454 F.3d at 1149 (quoting *Elstad*, 470 U.S. at 311). It reasoned instead that "absent deliberately coercive or improper tactics in obtaining the initial statement . . . subsequent administration of *Miranda* warnings ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* (quoting *Elstad*, 470 U.S. at 314). Conversely, in *Seibert*, a plurality of the Court found that interrogating officers withheld *Miranda* warnings "'to obscure both the practical and legal significance of the admonition when finally given' and that the interrogation reflected a strategy 'dedicating to draining the substance out of *Miranda*.'" *Id.* (quoting *Seibert*, 542 U.S. at 617).

In *Carrizales-Toledo*, the Tenth Circuit ruled that the brief exchange between agent and defendant was more analogous to *Elstad* than to *Seibert*. It explained that even if the questions were considered to be a custodial interrogation, they were made with "brevity and spontaneity" that "[fell] far short of the interrogator's conduct in *Seibert*, where 'the initial questioning was

systematic, exhaustive, and managed with psychological skill.'"   454 F.3d at 1152 (quoting

*Seibert*, 542 U.S. at 616).  It also considered four other factors set out by *Seibert*'s plurality:  the

two confessions had differing content; there was a time lapse, a change in location, and additional

officers present between the first and second confessions, which "all allowed Mr. Carrizales-

Toledo to see that the second round of questioning was a new and distinct experience rather than

a coordinated and continuing interrogation"; and there was "no evidence that the agents ever

referred back to [the] initial statements during the second interrogations." *Id.* (quotation omitted).

So too here.  Brown's questions to Defendant were brief.  Her question about the contents

of his pockets had immediate relevance to safety.  Her question about him driving a different car

was spontaneous.  It was Defendant who continued the conversation, asking whether, when, and

where Weatherford was killed.  Brown immediately prevented any further discussion by saying

they would talk after they arrived at the JPD station.  Although Defendant gave similar stories in

the first and the beginning of the second interactions, the other factors discussed in *Carrizales-*

*Toledo* weigh against finding a *Seibert* violation.  The second and third interviews happened after

a time lapse, a change of location, and a change of personnel; and there was no point in the

mirandized interviews when Brown referred back to the brief exchange while she walked

Defendant to the squad car.  Defendant has not demonstrated any indicia of a systematic,

exhaustive, or skillful interrogation in violation of *Seibert* in Brown's brief questioning.

Since *Seibert* does not warrant suppression of Defendant's pre-*Miranda* statements to

Brown, "the only remaining question with respect to the admissibility of [the] statements is

whether they were voluntary," as *Elstad* held that "subsequent administration of *Miranda* warnings

after a voluntary but unwarned custodial confession will 'remove the conditions that precluded

admission of the earlier statement.'" *Carrizales-Toledo*, 454 F.3d at 1153 (quoting *Elstad*, 470

U.S. at 314).  "The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne."  *Rith*, 164 F.3d at 1333.  Nothing indicates Defendant's will was "overborne" in the moments of his arrest.  As stated, *he* attempted to continue the conversation, asking Brown for details of the homicide.  She refrained from engaging with him at this point and told him that there would be time for discussion at the station, presumably after the warnings she immediately administered once in the interview room.

Chandlee's approach to Defendant's passcode is closer to the situation *Seibert* contemplated, but other circumstances weigh against exclusion.  Chandlee is seen on camera using air quotes as he discusses taking Defendant's phone to him so that they could put the phone in airplane mode to conserve the battery.  This indicates a purposeful intention to get Defendant's passcode before mirandizing him.  However, before Chandlee can put this plan into action, Defendant asks if he would like the passcode.  Defendant made this voluntary statement in the same situation and time when Defendant attempted to engage Brown in conversation about the homicide.  This does not give rise to a situation where the "substance" of *Miranda* is "drained out."  *See Carrizales-Toledo*, 454 F.3d at 1149.  Moreover, even if a *Seibert* violation had occurred with Chandlee's passcode ruse, the Court has ruled that the search warrant for Defendant's phone was not unconstitutionally obtained.  Thus, any information that JPD may have obtained from Defendant's phone would fall within the inevitable discovery doctrine, which "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

### 2.  April 23 statements

Defendant next challenges his April 23, 2018 JPD interview, claiming his *Miranda* rights should have been readministered in full.  Dkt. No. 56 at 8-9.  That morning, Brown entered the interview room and immediately told Defendant, "Your *Miranda* rights still stand."  Defendant contends this was insufficient.  This argument fails under Tenth Circuit law.

> The mere passage of time does not compromise a *Miranda* warning. Courts have consistently upheld the integrity of *Miranda* warnings even in cases where several hours have elapsed between the reading of the warning and the interrogation.  In *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995), for example, the court determined that new warnings were not required when the defendant was interviewed the day after the warnings had been given.

*Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (quotations and citations omitted). "An earlier *Miranda* warning is sufficient to cover a subsequent interrogation 'unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights.'" *Silsby v. Hamilton*, No. 16-CV-098-JHP-JFJ, 2019 WL 470909, at *4 (N.D. Okla. Feb. 6, 2019) (quoting *Mitchell*, 262 F.3d at 1058).  Defendant has not highlighted any serious changed circumstances.  The one changed circumstance he references—that Chandlee, rather than Weis, sat in on the second interview—did not fundamentally alter the interview dynamic, as both Chandlee and Weis had been part of the investigative team the night before and all other elements of the two interviews were similar.  Defendant and Brown were in the same room, discussing the same events, based on the same history.  There was no *Miranda* violation.

### B.  Invocation of counsel

Early in the April 23, 2018 interview, Brown asks Defendant if he still wanted to talk to her.  Defendant response, "yeah, I can still talk to you.  I wanted to talk to a lawyer—I just, wanted to see where I stand at right now."  Brown then gives a summary of their theory so far and

Defendant engages in conversation for approximately an hour before saying "You know, I really came out here at first to actually talk to a lawyer." Brown immediately stops the interview, the two discuss appointment of a lawyer, and Defendant says again, "I just kinda want to see where I stand at and everything." Brown asks whether that meant that Defendant did not want to talk to her any longer and Defendant replies, "I would, gladly, but I'd like to just see where I stand at right now." Brown then helps arrange for Defendant to call his mother about retaining an attorney. Defendant argues that his first statement was a clear invocation of his right to counsel. Dkt. No. 56 at 9-10.

The Supreme Court has held that "custodial interrogation may continue unless and until the suspect *actually invokes* his right to counsel; ambiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning." *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (emphasis in original) (citing *Davis v. United States*, 512 U.S. 452, 458-59 (1994)). *See also Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) ("If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong."). Invocation of counsel is an objective determination based on the question of "whether the suspect's statement is 'sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Nelson*, 450 F.3d at 1212 (quoting *Davis*, 512 U.S. at 459).

The circumstances at the beginning of the April 23, 2018 interview are equivocal at best. The first statement Defendant made to Brown was "Yeah, I can still talk to you." He then followed this statement with an unclear remark that he wanted "to see where I stand." The "see where I

stand" statement coupled with "yeah, I can still talk to you" could be construed that he wanted to see where he stood with JPD before spending the time and money of retaining counsel.  At the same time, the "see where I stand" statement could mean he wanted to see where he stood with a lawyer before continuing to talk to JPD.  This is exactly the sort of ambiguous situation that *Davis* and *Nelson* indicate does not require cessation of questioning.  The ambiguity of the situation was compounded when Brown gave him her summary of the case, as Defendant did not object and did not reiterate any sort of desire to consult a lawyer.  He instead chose to engage for approximately an hour before again mentioning a lawyer.  This second time, he did not say "yeah, I can still talk to you" and instead made his request for counsel clear.  While hindsight can discern similarities between the initial and later statements—both at the beginning and at the end of the interview, Defendant wanted to "see where he stood"—Brown and Chandlee did not have the benefit of hindsight at the beginning of the interview.  With the circumstances as they were at the start of the April 23, 2018 interview, it was not a Fifth Amendment violation for JPD to continue its questioning.

### C.  Voluntariness

Defendant's last Fifth Amendment argument is that his statements at the JPD station on April 22 and April 23, 2018 were made involuntarily and through psychological coercion because officers employed the "Reid technique," lied to Defendant, repeatedly referred to his three-year-old son and how Defendant would not see E.L. for a prolonged period if he was charged with and convicted of first degree murder, and refused to watch surveillance video with him.  Dkt. No. 56 at 10-18.

"Voluntariness is determined under the totality of the circumstances, and no single factor is determinative."  *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020).  "A number of

factors must be considered in assessing whether a confession is voluntary. These factors include the age, intelligence, and education of the suspect; the length of the detention and questioning; the use or threat of physical punishment; whether *Miranda* safeguards were administered; the accused's physical and mental characteristics; and the location of the interrogation." *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993). The Government bears the burden to establish voluntariness by a preponderance of the evidence. *Id.*

> The question this court must resolve is whether "the confession [is] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quoting *Perdue*, 8 F.3d at 1466).

Here, Defendant was a legal adult over the age of twenty-one (21). He had been enlisted in the United States military for six (6) years and had completed high school. JPD questioned him for approximately two (2) hours the first evening and one (1) hour the next morning. Brown, Weis, and Chandlee did not use or threaten the use of physical punishment. The only brief physical contact occurred when Defendant reached across a table to point at something on Weis' notepad and Weis brushed his hand back. *Miranda* safeguards were clearly given and, as stated earlier, applied to both the April 22 and April 23 interviews. Defendant did not exhibit any physical or mental difficulties, instead remaining coherent, generally polite, and conversational throughout the interviews. The interrogations took place in an office at JPD with padded chairs, good lighting, and drinking water easily available. None of these factors indicate that Defendant's will and self-determination had been critically impaired.

The Court next examines the specific reasons Defendant claims his statements were involuntary. First, Defendant describes the Reid technique as an approach that "heavily relies on

false evidence ploys and other forms of deceit." Dkt. No. 56 at 11.  He does not present any caselaw indicating that the Tenth Circuit has rejected the Reid technique, instead citing only a dissenting opinion from the Seventh Circuit.  Nor has he presented evidence that the Reid technique happened in this case, as he does not demonstrate *heavy* reliance on false ploys or deceit. Brown admitted on April 23 that she was "bluffin' him a little bit" on April 22 as far as what evidence JPD did or did not have.  The majority of what Brown, Weis, and later Chandlee referenced, however, was based on the video surveillance and witness testimony discussed earlier. Similarly, Defendant does not cite any cases that Brown's "bluffin'" negated the voluntariness of his statements considering the totality of the circumstances.

Defendant alleges the references to his son were psychological coercion.  Brown repeatedly described the consequences of a first degree murder charge, including a potential long period of incarceration and separation from Defendant's son.  These were descriptions of potential future realities, not an instance of manipulation.  Brown was not trying to extract a confession of premeditated murder to trump up greater chargers—it was clear from her questioning that premeditated murder *was* the planned charge at the time of Defendant's interviews.  Rather, Brown repeatedly asked Defendant for extenuating or mitigating circumstances that could form the basis for a lesser charge, which in turn could potentially mean less incarceration time and less separation from his son.  Describing the serious consequences of a first degree murder conviction was not coercion.  In fact, *mis*representing potential penalties may affect the voluntariness of a statement. *See Young*, 964 F.3d at 944 ("Although we do not require a law enforcement officer to inform a suspect of the penalties for all the charges he may face, if he misrepresents these penalties, then that deception affects our evaluation of the voluntariness of any resulting statements.").

Defendant's argument that he was deprived the opportunity to review surveillance footage fares no better. Even once indicted, a criminal defendant has no constitutional right to the discovery against him. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ."). JPD had no obligation to show the surveillance video to Defendant, and their refusal to watch it with him was not an overpowering of his will. Brown was clear that they would not review the videos with Defendant, yet he continued to talk with JPD. That was Defendant's free and unconstrained choice.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's motions to suppress [Dkt. No. 54 and Dkt. No. 56] are hereby DENIED.

DATED the 2nd day of November 2022.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE